# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| VINCENT WOODHOUSE, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 7:19cv00634 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| HAROLD CLARKE, *et al.*, ) | By:  Hon. Thomas T. Cullen |
| ) | United States District Judge |
| Defendants. ) | |

Plaintiff Vincent Woodhouse, a prisoner proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983, against eleven employees of the Virginia Department of Corrections ("VDOC") alleging violation of his constitutional rights.[1] This matter is before the court on Defendants' motions to dismiss and for summary judgment, and Woodhouse's motion for injunctive relief. After reviewing the record, the court concludes that Woodhouse failed to exhaust his administrative remedies as to his claims against Defendant Kiser and, therefore, will grant Kiser's motion for summary judgment. The court will grant in part and deny in part the remaining Defendants' motion to dismiss because the court concludes that Woodhouse fails to state a claim against Defendants Clarke, Manis, Collins, Arms, and Elam but has alleged facts against Defendants Ely, Fleming, Light, and Anderson that are sufficient to survive a motion to dismiss.

---

[1] Defendants in this action are Harold Clarke, Warden Carl Manis, Collins, Unit Manager Ely, Lieutenant K.M. Fleming, VDOC Investigator Arms, Lieutenant Light, Regional Administrator Marcus Elam, and Warden Kiser. The Chief of Housing & Programs was terminated from this action on December 10, 2019. (*See* ECF No. 28)

I.

In May 2017, defendant Special Gang Investigator Arms conducted an interview with Woodhouse at Red Onion State Prison ("Red Onion"). Woodhouse alleges that after Investigator Arms completed the investigation, he issued a report stating, "[I]t is likely that [Woodhouse] has been labeled a "snitch" by Bloods [gang members]," and, "[R]eleasing [Woodhouse] into general population anywhere in [the VDOC] is not advised." Investigator Arms recommended that "Woodhouse be transferred out of state." Woodhouse asserts that "because [he] has been labeled a 'snitch,'" "[he] should be placed in protective custody or sent to another state." Woodhouse claims that Investigator Arms' report was given to Defendant Red Onion Warden Kiser. Woodhouse alleges that, in October 2018, he was released into general population into a "housing unit filled with Bloods [gang members]" at Red Onion, "even though [Red Onion officials] were made aware [he] was at risk of serious harm."

Woodhouse claims that on November 1, 2018, while still housed at Red Onion, he was "attacked and stabbed by [five] Blood members, [leaving injuries,] including a puncture wound to the head." Woodhouse was sent to the hospital for treatment, including stitches, and he alleges that he "now suffer[s] from blurred vision and nightmares." He states that in November 2018, Warden Kiser "informed [him] that he was sending [Woodhouse] to Wallens Ridge State Prison [("Wallens Ridge")]." When Woodhouse "begged Warden Kiser to place [him] in protective custody, [Warden Kiser] denied [the] request." Woodhouse was transferred to Wallens Ridge on November 23, 2018.

Woodhouse claims that, after arriving at Wallens Ridge, he "was brought in front of the Multi[-]Disciplinary [T]eam (MDT)" to determine his appropriate housing assignment and

"[he] advised them [that he] had been labeled a 'snitch' by Bloods in the V[]DOC." Defendants Anderson, Ely, Fleming, and Light are all members of the MDT at Wallens Ridge. Woodhouse alleges the MDT denied his request for protective custody and "placed [him] in [a g]eneral [p]opulation" housing assignment that "was filed with Bloods" gang members. Woodhouse claims that on March 5, 2019, he "received threats from Blood[s] members" and that he "was in a fight with a Blood[s] gang m]ember." Woodhouse alleges that during the fight, "[t]he control room officer shot [him] in the back multiple times, to end the fight [and that he] now suffer[s] from chronic back pain."

After the fight, Woodhouse was "placed in segregation" at Wallens Ridge. Woodhouse alleges that in April 2019, he was taken to the MDT and he again advised them that he "had been labeled a snitch by Bloods [gang members] in [the] V[]DOC," and he requested to be placed in protective custody. Once again, the MDT allegedly denied his request for protective custody and placed him in a general population housing unit "filed with Bloods" gang members. Woodhouse claims that upon "receiving [more] threats from Blood members," he "gave a weapon to Sgt. Ferguson and [he] begged [Sgt. Ferguson] to place [him] in [s]egregation [because his] life was in danger." Woodhouse was placed in segregation.

Woodhouse alleges that in July 2019, he told the MDT of his safety concerns as a "snitch" and requested protective custody. His request was again denied, and he was again assigned to a general population housing unit.    Woodhouse states that he refused to move into general population "because [he] fear[ed] for his safety" and he was consequently "given a [disciplinary] charge" for it. Woodhouse alleges that he currently "remain[s] in segregation indefinitely." He claims that he suffers from depression and that the "horrific experiences" of

his incarceration have "made [his] mental illness worse." He summarily argues that his "confinement [in segregation is] an atypical and significant hardship." Woodhouse claims the defendants were "deliberate[ly] indifferen[t]" to his mental health and personal safety in violation of his rights to due process and to be free from cruel and unusual punishment under the Fourteenth Amendments and Eighth Amendments. Woodhouse also claims the MDT hearings violated his rights to due process and constituted cruel and unusual punishment.

Woodhouse seeks permanent injunctive relief in the form of being "sent[t] out of State and housed in that State[']s protective custody unit." He also seeks "compensatory damages in the amount of $50,000 against each defendant, jointly and severally," "punitive damages in the amount of $100,000 against each defendant," and his costs in this suit as well as "any additional relief this court deems just, proper, and equitable."[2]

## II.

### A.

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it

---

[2] Woodhouse also requests the court issue a preliminary injunction releasing him from solitary confinement. (*See* ECF No. 25). A preliminary injunction is an extraordinary and drastic remedy. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). The general standard for imposing preliminary injunctive relief "requires parties seeking preliminary injunctions to demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013); *see also Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7 (2008). The court must be mindful that "in the prison context, a request for injunctive relief must always be viewed with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." *Barnett v. Young*, No. 5:18-cv-279, 2018 WL 3405415, at *2 (S.D. W. Va. June 21, 2018). "It is well settled that the decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 38 (2002); *see also Farabee v. Clarke*, No. 7:16-CV-00325, 2018 WL 4102257, at *2 (W.D. Va. Aug. 27, 2018) (finding a change in housing status is not warranted when the plaintiff's safety would be placed at risk). Woodhouse fails to allege irreparable harm will occur without preliminary relief, that the factors of equity tip in his favor, or that the public interest would be served with a preliminary injunction. Accordingly, the court denies Woodhouse's motion for preliminary injunction.

does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Legal conclusions in the guise of factual allegations, however, are not entitled to a presumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and quotations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level," *id.*, with all the allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005). Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.

In order to allow for the development of a potentially meritorious claim, federal courts have an obligation to construe pro se pleadings liberally. See, e.g., *Boag v. MacDougall*, 454 U.S. 364, 365 (1982). Moreover, "[l]iberal construction of the pleadings is particularly appropriate

where . . . there is a pro se complaint raising civil rights issues." *Smith v. Smith*, 589 F.3d 736, 738 (4th Cir. 2009). Nevertheless, "[p]rinciples requiring generous construction of pro se complaints are not . . . without limits." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). "A pro se plaintiff still must allege facts that state a cause of action." *Bracey v. Buchanan*, 55 F. Supp. 2d 416, 421 (E.D. Va. 1999).

## B.

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted). In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the

merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

### III.

Turning first to Defendants' motion to dismiss,[3] Woodhouse fails to state a claim against Defendants Clarke, Warden Manis, Major Collins, Regional Administrator Elam, and Investigator Arms, because he does not identify any personal involvement of these defendants which would give rise to a cognizable federal claim. Accordingly, the court will grant their motion to dismiss.

"To state a claim under § 1983[,] a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Loftus v. Bobzien*, 848 F.3d 278, 284–85 (4th Cir. 2017) (internal quotation marks omitted). Liability under § 1983 is "personal, based upon each defendant's own constitutional violations." *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (internal citation omitted). Thus, a § 1983 claim requires factual detail about each defendant's personal involvement. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (explaining that liability will lie under § 1983 only "where it is affirmatively shown that the official charged acted personally" in the violation of plaintiff's rights and affirming dismissal

---

[3] Defendant Warden Kiser is not a party to this motion.

of claim where plaintiff did not allege personal involvement by defendant) (quoting *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977)). A failure to allege personal involvement by the defendants is fatal to a claim. *Vinnedge* 550 F.2d at 928 (internal citations omitted) (finding that as there was a failure "to allege any personal connection" and that the action, therefore, "must fail").

Woodhouse does not to make any factual allegations against defendants Clarke, Manis, Collins, and Elam. The only allegations against Defendant Investigator Arms is that he labeled Woodhouse as an at-risk inmate and recommended out-of-state transfer. A § 1983 claim requires factual detail about each defendant's personal involvement in an asserted claim. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017). As Woodhouse fails to allege personal involvement of Defendants Clarke, Manis, Collins, Elam, and Arms *in violating* his federal rights, the court will grant Defendants' motion to dismiss as to the claims against these defendants.

## IV.

Defendants Anderson, Ely, Fleming, and Light assert that Woodhouse's due process claim fails as he has no constitutional right to a particular security classification. The court agrees and will grant the motion to dismiss this claim.

The initial inquiry for a prisoner's due process claim is whether the plaintiff has demonstrated that he has been deprived of a protected liberty interest. *Sandin v. Conner*, 515 U.S. 472, 477–78 (1995). Liberty interests which are protected by the Fourteenth Amendment arise from two sources—the Due Process Clause and the laws of the states. *Hewitt v. Helms*, 459 U.S. 460, 466 (1983) (citing *Meachum v. Fano*, 427 U.S. 215, 223–27 (1976)). Prison officials

have "broad administrative and discretionary authority over the institutions they manage," and "lawfully incarcerated persons retain only a narrow range or protected liberty interests." *Id.* at 467 (citing *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974)). As long as the degree of confinement a prisoner is subjected to is "within the sentence imposed upon him" and does not otherwise violate the Constitution, the Due Process Clause "does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Id.* at 468 (quoting *Montanye v. Haymes*, 427 U.S. 236, 242 (1976)). Under certain circumstances, states—through their correctional policies—may create liberty interests for prisoners which are protected by the Due Process Clause, but these interests are generally limited "to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483–84; *see also Garrett v. Angelone*, 940 F. Supp. 933, 943 (W.D. Va. 1996) (finding that a prison regulation creates a liberty interest and implicates due process protections only where the regulation imposes upon the inmate conditions that dramatically depart from the expected conditions of his sentence). A liberty interest under the Due Process Clause arises only when, independent of state law, a deprivation exceeds the prisoner's sentence in an unexpected manner or when state law of a mandatory character imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 486–87. Therefore, a determination must be made regarding whether the conditions suffered were expected within the contours of the actual sentence imposed. *Id.* at 485.

In regard to a particular security classification, "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of

confinement ordinarily contemplated by a prison sentence." *Hewitt,* 459 U.S. at 468. Inmates do not have a liberty interest in a particular security classification or in freedom from segregation; "reclassification into a different security level is simply an incident of prison life." *Shelton v. Angelone*, 183 F. Supp. 2d 830, 838–39 (W.D. Va. 2002). Woodhouse has not made any allegations of conditions which are "atypical and significant hardship[s] in relation to the ordinary incidents of prison life" which dramatically depart from the expected conditions of his sentence. *See Sandin*, 515 U.S. at 483–84; *see also Garrett*, 940 F. Supp. at 943.

As Woodhouse has no liberty interest in a particular classification level and has not alleged atypical and significant hardship, his due process claim fails. Therefore, the court will grant the defendants' motion to dismiss regarding this claim.

## V.

Insofar as Woodhouse's claims can be construed as a failure-to-protect claim against Defendants Anderson, Ely, Fleming, and Light, the court concludes that Woodhouse has alleged a sufficient factual basis to survive a motion to dismiss.

An officer's failure-to-protect an inmate from assaults by fellow inmates can give rise to a constitutional violation under the Eighth or Fourteenth Amendments. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.") (internal quotations and citations omitted); *Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir.1987) ("The Eighth Amendment protects a convicted inmate from physical harm at the hands of fellow inmates."). To bring a § 1983 claim against an official for failing to protect from injury, the prisoner plaintiff must establish that: (1) he was "incarcerated under conditions posing a substantial risk of serious harm"; and (2) the defendant prison

official had a "sufficiently culpable state of mind," one of "deliberate indifference." *Farmer*, 511 U.S. at 834. Deliberate indifference is "somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law." *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). A claim must plausibly allege that the actor had actual knowledge of plaintiff's serious risk of harm and that they intentionally disregarded a risk of harm. *See, e.g., Goodman v. Wexford Health Sources, Inc.*, 425 F. App'x 202 (4th Cir. 2011) (holding that a plaintiff's allegation that the nurse knew about his medical condition, without more, was insufficient to support a finding that the nurse had a sufficiently culpable state of mind of deliberate indifference to a serious medical condition); *Judd v. Buncombe Cty.*, No. 1:19-CV-00303-MR, 2020 WL 2748304, at *3 (W.D.N.C. May 27, 2020). "This subjective inquiry requires "evidence suggesting that the prison official had actual knowledge of an excessive risk to the plaintiff's safety." *Raynor v. Pugh*, 817 F.3d 123, 128 (4th Cir. 2016) (citing *Danser v. Stansberry*, 772 F.3d 340, 347 (4th Cir. 2014)). "The plaintiff may satisfy the deliberate indifference element with evidence that the challenged circumstances created a "substantial risk" of harm that "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past[.]" *Harvey v. Landauer*, No. 7:18-CV-00097, 2020 WL 3799197, at *6 (W.D. Va. July 7, 2020) (quoting *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015)).

A plaintiff must further show that the harm suffered because of the failure-to-protect was objectively serious, i.e., he must show he suffered a "serious or significant physical or emotional injury." *Danser*, 772 F.3d at 346; *see also De Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003); *Ward v. Blackwell*, No. 4:17-CV-0367-DCC-TER, 2018 WL 3133364, at *7 (D.S.C. Feb. 6, 2018), *report and recommendation adopted*, No. 4:17-CV-00367-DCC, 2018 WL 2244621

(D.S.C. May 16, 2018) (declining to grant summary judgment on a failure-to-protect claim where the Plaintiff suffered a head laceration); *Silk v. Hutcheson*, No. 7:20-CV-00222, 2020 WL 4017847, at *1 (W.D. Va. July 16, 2020) (finding significant physical injury occurred when facial bones and teeth were damaged in an assault). Mental health concerns can fulfil the objectively serious prong under certain circumstances. *See, e.g.*, *Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001) (quoting *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir.1992) (applying the deliberate indifference standard to the conduct of government officials when a prisoner suffers from a "serious psychological condition[ ]" such as being suicidal).

While Woodhouse was at Red Onion, Investigator Arms prepared a report stating Woodhouse had likely been labeled a "snitch" by gang members and recommended he be transferred-out-of-state. Woodhouse alleges he was stabbed by five Blood members on November 1, 2018, while in general population at Red Onion. Woodhouse was subsequently transferred to Wallens Ridge. Defendants Anderson, Ely, Fleming, and Light are all members of the MDT and allegedly assigned Woodhouse to general population at Wallens Ridge after Woodhouse "advised [the MDT that he] had been labeled a 'snitch' by Bloods in the V[]DOC." Woodhouse alleges that his request for protective custody was denied by the MDT and he was placed in a general population housing assignment that "was filed with Bloods" gang members. On March 5, 2019, Woodhouse "received threats from Blood[s] members" and a "fight with a Blood[s] Member" resulted. Woodhouse alleges that during the fight, "[t]he control room officer shot [him] in the back multiple times, to end the fight [and that he] now suffer[s] from chronic back pain."

Accepting these disturbing allegations as true and drawing all reasonable inferences in Woodhouse's favor, the court concludes that Woodhouse states a plausible claim that defendants Anderson, Ely, Fleming, and Light failed to protect him from an obvious threat of gang-related violence. Accordingly, the court will deny defendants' motion to dismiss as to the failure-to-protect claim against defendants Anderson, Ely, Fleming, and Light.

## VI.

Defendant Warden Kiser has moved for summary judgment, asserting that Woodhouse failed to exhaust his available administrative remedies prior to filing suit, as is required by 42 U.S.C. §1997e(a). For the following reasons, the court will grant defendant Kiser's motion for summary judgment.

### A.

The Prison Litigation Reform Act ("PLRA") provides, among other things, that a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies. *Nussle v. Porter*, 534 U.S. 516, 524 (2002) (interpreting 42 U.S.C. §1997e(a)). The exhaustion requirement of § 1997e(a) applies to "all inmate suits" regardless of if the form of relief sought is available through exhaustion of administrative remedies. *Id.* An inmate must follow all steps of the established administrative procedure that the state provides to prisoners and meet all deadlines of that procedure before filing a § 1983 action. *See Woodford v. Ngo*, 548 U.S. 81, 90-94 (2006). An inmate's failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim. *Id.* at 90.

But the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Accordingly, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d at 725. "The benefits of proper exhaustion are only realized if the prison grievance system is given a fair opportunity to consider the grievance which will not occur unless the grievant complies with the system's critical procedural rules." *Miles v. Taylor*, No. 1:16CV602 (LMB/JFA), 2016 WL 8261717, at *1 (E.D. Va. July 5, 2016), *aff'd*, 670 F. App'x 79 (4th Cir. 2016) (citing *Woodford*, 548 U.S. at 95) (internal quotations omitted).

### B.

In support of Warden Kiser's motion for summary judgment, Human Rights Advocate Messer provides an affidavit which is accompanied by the VDOC Offender Grievance Procedure, Operating Procedure ("OP") 866.1 and Woodhouse's grievance records related to the claim against Warden Kiser. OP 866.1 details the grievance process by which offenders must resolve complaints, appeal administrative decisions, and challenge the substance of procedures. The grievance process provides correctional staff a means to evaluate potential problem areas and, if necessary, correct those problems in a timely manner.

Prior to submitting a regular grievance, an inmate must demonstrate that he has made a good-faith effort to informally resolve his complaint. According to OP 866.1, this good-faith effort generally must be documented using an informal complaint. Once an inmate files an

informal complaint, it is logged in VACORIS, the VDOC's computer-based offender information management system, and a receipt is issued to the inmate. Within fifteen days, staff should respond to the informal complaint. If an inmate is not satisfied with the response to the informal complaint, he may file a regular grievance. If a response is not given to the inmate within fifteen days of the informal complaint being logged, the inmate may proceed to filing a regular grievance and must attach the receipt of the informal complaint to the regular grievance as documentation of his attempt to resolve the issue informally.

A regular grievance generally must be filed within thirty days from the date of the incident. Regular grievances are date-stamped on the working day they are received. If the grievance meets the criteria for acceptance, it is logged in VACORIS and receipt is issued to the inmate within two working days. If the grievance does not meet the criteria for acceptance, the grievance is returned to the inmate within two working days with an explanation for why the grievance was rejected at intake. Intake rejections can be appealed to the Regional Ombudsman. The Regional Ombudsman's review of the intake decision is the final level of review.

If a grievance is accepted at intake, it may proceed through up to three levels of review. Grievances must be appealed through all available levels of review to satisfy the requirement of exhaustion before filing a § 1983 lawsuit. Level I reviews are conducted by the Warden or Superintendent of the prison. If the inmate is dissatisfied with the determination, he may appeal the determination to Level II. Level II responses are provided by the Regional Administrator, Health Services Director, Chief of Operations for Offender Management Services, or Superintendent for Education. For most issues, Level II is the final level of review.

## C.

On November 15, 2018, while he was housed at Red Onion, Woodhouse submitted a regular grievance, complaining that five Bloods gang members attacked and stabbed him on November 1, 2018. Woodhouse alleged that prison officials had knowledge of impending harm that was easily preventable but were indifferent to his welfare. Warden Kiser provided a Level I response to Woodhouse on December 10, 2018, and determined that Woodhouse's grievance was unfounded and no further action was necessary.[4] Woodhouse did not appeal the grievance response to Level II. Woodhouse does not allege that he was prevented from appealing his grievance response.

A prisoner cannot bring a civil action unless he has first exhausted available administrative remedies. *Nussle v. Porter*, 534 U.S. 516, 524 (2002) (interpreting 42 U.S.C. §1997e(a)). Woodhouse failed to exhaust his administrative remedies prior to filing this suit and alleges no facts to dispute or overcome this. The "mandatory language [of the PLRA] means a court may not excuse a failure to exhaust." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citing *Miller v. French*, 530 U.S. 327, 337 (2000)). Finding no genuine dispute of material fact, the court concludes that defendant Warden Kiser is entitled to summary judgment as a matter of law because Woodhouse failed to exhaust available administrative remedies as to the claim against Warden Kiser.

---

[4] On December 10, 2018, Warden Kiser also advised Woodhouse that documentation demonstrated he had requested to remain in VDOC instead of being transferred out-of-state. Warden Kiser further alleges that he reminded Woodhouse that he had signed a written statement on April 23, 2018, stating that he did not fear for his safety in general population at Red Onion.

## VII.

For the reasons discussed, the court will deny Woodhouse's motion for preliminary injunction, grant in part and deny in part the other Defendants' motion to dismiss, and grant Warden Kiser's motion for summary judgment. Therefore, the sole remaining claim is a failure-to-protect claim against defendants Anderson, Ely, Fleming, and Light.

The Clerk shall send a copy of this memorandum opinion and accompanying order to the parties.

**ENTERED** this 31st day of March, 2021.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE