IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| VINCENT WOODHOUSE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:19cv00634 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| MAJOR ANDERSON, *et al.*, | ) | By: Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

Plaintiff Vincent Woodhouse, a Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983, against employees of the Virginia Department of Corrections ("VDOC"), alleging violation of his constitutional rights. By Memorandum Opinion and Order entered March 31, 2021, the court granted the defendants' motions to dismiss and for summary judgment as to all of Woodhouse's claims except his failure-to-protect claims against defendants Anderson, Ely, Fleming, and Light. (*See* ECF Nos. 54 and 55.) This matter is before the court on these remaining defendants' motion for summary judgment. After reviewing the record, the court concludes that Woodhouse failed to exhaust available administrative remedies as to the remaining claims and, therefore, will grant the defendants' motion for summary judgment.

I.

Woodhouse alleges that in May 2017, Special Gang Investigator Arms conducted an interview with Woodhouse at Red Onion State Prison ("Red Onion"). Investigator Arms subsequently determined that it was "likely [that] Woodhouse ha[d] been [] labeled as a

'snitch' by Bloods [gang members]," and that Woodhouse was a "candidate to be considered for protective custody or out-of-state transfer." (*See* ECF No. 1-1 at 1.) Woodhouse also alleges that Investigator Arms noted that "releasing [Woodhouse] into general population anywhere in [the VDOC] is not advised." (*See* ECF No. 1 at 3.) Investigator Arms recommended that "Woodhouse be transferred out of state." (*See* ECF No. 1-1 at 1.) At an Institutional Classification Authority ("ICA") Hearing in June 2017, the ICA recommended that Woodhouse be transferred out of state. (*Id.*)

But in April 2018, Woodhouse signed a statement that he was not in fear for his safety in general population or progressive housing at Red Onion.[1] (*See* ECF No. 59-1 at 24.) In October 2018, Woodhouse was released into general population in a "housing unit [he alleges was] filled with Bloods" gang members at Red Onion, "even though [Red Onion officials] were made aware [he] was at risk of serious harm." (*See* ECF No. 1 at 3.)

Woodhouse claims that on November 1, 2018, while he was still housed at Red Onion in the general population housing unit, he was "attacked and stabbed by [five] Blood members, [leaving injuries,] including a puncture wound to the head." (*Id.*) Woodhouse was sent to the hospital for treatment, and he alleges that he "now suffer[s] from blurred vision and nightmares." (*Id.*) He states that in November 2018, the Warden at Red Onion "informed [him] that he was sending [Woodhouse] to Wallens Ridge State Prison" ("Wallens Ridge"). (*Id.*) When Woodhouse "begged" the Warden to "place [him] in protective custody, [the Warden] denied [the] request." (*Id.*) Woodhouse was transferred to Wallens Ridge on

---

[1] Woodhouse also stated that he wanted to go out of state because his "family was gone," but that he was "good" and "no longer fear[ed] for [his] life at Red Onion." (*Id.*)

November 23, 2018.

Woodhouse claims that, after arriving at Wallens Ridge, he "was brought in front of the Multi[-]Disciplinary [T]eam" ("MDT")[2] to determine his appropriate housing assignment (*id.*); all of the remaining defendants are members of the MDT at Wallens Ridge.[3] Woodhouse states that he "advised them [that he] had been labeled a 'snitch' by Bloods in the V[]DOC," but that the MDT denied his request for protective custody and "placed [him] in [a g]eneral [p]opulation" housing assignment that "was filled with Bloods." (*See* ECF No. 1 at 3-4.) Woodhouse claims that on March 5, 2019, he "received threats from Blood[s] members," and that he "was in a fight with a Blood[s gang m]ember." (*See* ECF No. 1 at 4.) Woodhouse alleges that during the fight, "[t]he control room officer shot [him] in the back multiple times, to end the fight [and that he] now suffer[s] from chronic back pain."[4] (*Id.*) After the fight, Woodhouse was "placed in segregation" at Wallens Ridge. (*Id.*)

---

[2] VDOC Operating Procedure ("OP") 830.1 states that "MDT members are responsible to review individual inmates related to restorative housing and step-down statuses and act as the Institutional Classification Authority to make recommendations for housing status, transfer, security level, good time class, etc." *See* VA Dep't of Corr. Operating Proc., OP 830.1, Facility Classification Management, Definitions, *available at* https://vadoc.virginia.gov/general-public/operating-procedures/ (last visited Jan. 13, 2022). Hearings are held at least annually, for various reasons, including the inmate's possible removal from general population status, a reduction in good-time earning level, an increase in security level, a potential transfer to a higher security level institution, removal from a restorative housing unit, requested transfers during an annual review, requested keep-separate designations, assignment to a work-release program, or requested assignments to or removal from a religious diet, among many others. *Id.* at OP 830.1(I)(B)(2)(a), (c), and (d).

[3] It is unclear from the record whether defendants Anderson, Ely, Fleming, and Light were members of the MDT at Red Onion and thus had input in his housing assignments at Red Onion. Woodhouse does not explicitly allege that they were but the defendants address Woodhouse's placement in general population at Red Onion prior to the November 2018 attack. Accordingly, for the purposes of this opinion, the court will assume that the defendants were involved in the decision at Red Onion. To the extent that other staff were responsible for that decision, the claim is nevertheless unexhausted.

[4] The court notes that Woodhouse does not allege that any of the defendants were present at the time of the fight or the November 2018 attack and, therefore, he does not allege that the defendants were liable as bystanders. *See Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002) (noting that, under the theory of bystander liability, an officer may be liable if he or she: "(1) knows that a fellow officer is violating an

Woodhouse alleges that in April 2019, he was taken to the MDT for another periodic classification review hearing, where he again advised them that he "had been labeled a snitch by Bloods [gang members] in [the] V[]DOC," and requested to be placed in protective custody. (*Id.*) Once again, the MDT allegedly denied his request for protective custody and placed him in a general population housing unit "filled with Bloods" gang members. (*Id.*) Woodhouse claims that upon "receiving [more] threats from Blood members," on May 29, 2019, he "gave a weapon to Sgt. Ferguson and [he] begged [Sgt. Ferguson] to place [him] in [s]egregation [because his] life was in danger." (*Id.*; ECF No. 1-1 at 2.) Woodhouse was again placed in segregation.

On July 9, 2019, at another classification review hearing, Woodhouse stated that he "would release to [general population] under the right circumstances . . . in a situation where he felt safe." (*See* ECF No. 1-1 at 9.) Woodhouse also alleges that he told the MDT that he had been labeled a "snitch" and requested protective custody. (*See* ECF No. 1 at 4.) The MDT recommended that Woodhouse be released to general population pending bed space, noting that Woodhouse was "[n]ot viewed as a threat to [Wallens Ridge] at th[at] time." (*See* ECF No. 1-1 at 9.) On July 15, 2019, Woodhouse refused to move from segregation into general population "because [he] fear[ed] for his safety," and he was consequently "given a [disciplinary] charge" for it. (*See* ECF No. 1 at 4.)

On July 30, 2019, after another periodic classification review hearing, the MDT recommended that Woodhouse remain in segregation. (*See* ECF No. 67-1 at 19.) At the

---

individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act").

time of his complaint in September 2019, Woodhouse alleged that he "remain[s] in segregation indefinitely." (*See* ECF No. 1 at 4.)

## II.

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (internal citations omitted). In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form

of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

### III.

The remaining defendants have moved for summary judgment, asserting that Woodhouse failed to fully exhaust his available administrative remedies prior to filing suit, as is required by 42 U.S.C. §1997e(a). For the following reasons, the court will grant the defendants' motion for summary judgment.

### A.

The Prison Litigation Reform Act ("PLRA") provides, among other things, that a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted available administrative remedies. *Nussle v. Porter*, 534 U.S. 516, 524 (2002) (interpreting 42 U.S.C. §1997e(a)). The exhaustion requirement of § 1997e(a) applies to "all inmate suits" regardless of if the form of relief sought is available through administrative remedies. *Id.* An inmate must follow all steps of the established administrative procedure that the state provides to prisoners and meet all deadlines of that procedure before filing a § 1983 action. *See Woodford v. Ngo*, 548 U.S. 81, 90–94 (2006). An inmate's failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim. *Id.* at 90.

But the court is "obligated to ensure that any defects in administrative exhaustion were

not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Accordingly, an inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). "The benefits of proper exhaustion are only realized if the prison grievance system is given a fair opportunity to consider the grievance which will not occur unless the grievant complies with the system's critical procedural rules." *Miles v. Taylor*, No. 1:16CV602 (LMB/JFA), 2016 U.S. Dist. LEXIS 189747, at *2 (E.D. Va. July 5, 2016), *aff'd*, 670 F. App'x 79 (4th Cir. 2016) (citing *Woodford*, 548 U.S. at 95) (internal quotations omitted).

## B.

In support of the defendants' motion for summary judgment, Human Rights Advocates C. Meade (Red Onion) and B. Ravizee (Wallens Ridge) provided affidavits that include the VDOC Offender Grievance Procedure, Operating Procedure ("OP") 866.1, and Woodhouse's grievance records related to the remaining claims against the defendants. OP 866.1 details the grievance process by which offenders must resolve complaints, appeal administrative decisions, and challenge the substance of procedures. The grievance process provides correctional staff a means to evaluate potential problem areas and, if necessary, correct those problems in a timely manner.

Prior to submitting a regular grievance, an inmate must demonstrate that he has made a good-faith effort to informally resolve his complaint. According to OP 866.1, this good-faith effort generally must be documented using an informal complaint. Once an

inmate files an informal complaint, it is logged in VACORIS, the VDOC's computer-based offender information management system, and a receipt is issued to the inmate. Within 15 days, staff should respond to the informal complaint. If an inmate is not satisfied with the response to the informal complaint, he may file a regular grievance. If a response is not given to the inmate within 15 days of the informal complaint being logged, the inmate may proceed to filing a regular grievance and must attach the receipt of the informal complaint to the regular grievance as documentation of his attempt to resolve the issue informally.

A regular grievance generally must be filed within 30 days from the date of the incident. Regular grievances are date-stamped on the working day they are received. If the grievance meets the criteria for acceptance, it is logged in VACORIS and receipt is issued to the inmate within two working days. If the grievance does not meet the criteria for acceptance, the grievance is returned to the inmate within two working days with an explanation for why the grievance was rejected at intake. Intake rejections can be appealed to the Regional Ombudsman. The Regional Ombudsman's review of the intake decisions is the final level of review.

If a grievance is accepted at intake, it may proceed through up to three levels of review. Grievances must be appealed through all available levels of review to satisfy the requirement of exhaustion before filing a § 1983 lawsuit. Level I reviews are conducted by the Warden or Superintendent of the prison. If the inmate is dissatisfied with the determination, he may appeal the determination to Level II. Level II responses are provided by the Regional Administrator, Health Services Director, Chief of Operations for Offender Management Services, or Superintendent for Education. For most issues, Level II is the final

level of review.

## C.

On November 8, 2018, Woodhouse filed an informal complaint stating that prison officials were deliberately indifferent to a serious risk to his safety and that he was consequently attacked on November 1, 2018. (*See* ECF No. 59-1 at 23.) On November 15, 2018, a response stated that Woodhouse had been scheduled to be transferred out of state, but that he asserted that he no longer feared for his life, did not want to be transferred out of state, and wished to be placed in general population. (*Id.*) That same day, Woodhouse submitted a regular grievance, ROSP-18-REG-00293, complaining that he had been attacked on November 1, 2018, and that prisoner officials knew of and disregarded the risk. (*See* ECF No. 59-1 at 21.) Woodhouse asked to be placed in protective custody. On December 10, 2018, the Warden responded and stated that "[d]ocumentation shows that [Woodhouse] requested to remain in [the VDOC] instead of transferring out of state." (*Id.* at 22.) The response also noted that Woodhouse "signed a written statement on April 23, 2018, stating that [he] did not fear for [his] safety and requested to be placed in general population at [Red Onion]." (*Id.*) Woodhouse did not appeal the grievance response to Level II. Woodhouse does not allege that he was prevented from appealing this grievance response.[5]

In response to the defendants' motion for summary judgment, Woodhouse alleges

---

[5] The defendants also submit another informal complaint filed by Woodhouse on March 5, 2019, related to defendant Ely, but it does not appear related to the remaining allegations of this complaint. (*See* ECF No. 59-2 at 21.) In the informal complaint, Woodhouse states that on March 5, 2019, Unit Manager ("UM") Ely asked Woodhouse if any medical staff "got hurt when [Woodhouse] got into a fight," and when Woodhouse responded that they had not, UM Ely instructed officers to give him empty food trays. (*Id.*)

- 9 -

that he raised concerns that staff failed to protect him in three separate grievances. (*See* ECF No. 67-1 at 2–12.) Woodhouse filed grievance WRSP-19-REG-00331 on July 16, 2019, WRSP-19-REG-00350 on July 26, 2019, and WRSP-19-REG-00364 on August 5, 2019. All of Woodhouse's grievances were filed several months after the two incidents where he was allegedly involved in incidents with Blood gang members (in November 2018 and March 2019).

On July 9, 2019, an ICA hearing was held to review Woodhouse's housing assignment, and the MDT recommended that Woodhouse be released to general population. Approximately one week later, in grievance WRSP-19-REG-00331, Woodhouse complained that prison officials acted with deliberate indifference to his safety when they released him to general population.

On July 18, 2019, after Woodhouse refused to go to general population, he was referred for another ICA hearing where the MDT recommended that he remain in segregation. According to the ICA hearing report, Woodhouse stated at the hearing that the MDT continued to recommend that he be released to general population where he was "placed in a pod with rival gang members and constantly in fear for his personal safety." (*See* ECF No. 67-1 at 13.) In grievance WRSP-19-REG-00350, Woodhouse complained that prison officials "violated [his] procedural due process [at the July 18 hearing] when the ICA altered [his] statement" because he did not state that he was in a gang. Woodhouse requested a new ICA hearing.

In grievance WRSP-19-REG-00364, Woodhouse complained that the Commonwealth's Attorney blocked prison officials at Wallens Ridge from sending

Woodhouse out of state and that officials were trying to use segregation in the restricted housing unit as a pretext for indefinite confinement. Woodhouse requested a transfer out of state.

All three of these grievances were fully exhausted through appeals; however, none of them relate to the defendants' decisions leading up to the November 18, 2018 or March 5, 2019 incidents, which give rise to the remaining claims. Moreover, all of these grievances were filed well beyond the 30-day time limit within which to file a timely grievance.

A prisoner cannot bring a civil action unless he has first exhausted available administrative remedies. *Nussle v. Porter*, 534 U.S. 516, 524 (2002) (interpreting 42 U.S.C. § 1997e(a)). Woodhouse failed to exhaust his administrative remedies prior to filing this suit and alleges no facts to dispute or overcome this. The only regular grievance Woodhouse filed related to the decisions leading to his attacks—ROSP-18-REG-00293—was not appealed, and therefore not exhausted. *See Woodford*, 548 U.S. at 90 (noting that an inmate's failure to follow the required procedures of the prison's administrative remedy process, including exhausting all levels of administrative review is not "proper exhaustion" and will bar the claim.) The "mandatory language [of the PLRA] means a court may not excuse a failure to exhaust." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citing *Miller v. French*, 530 U.S. 327, 337 (2000)). Finding no genuine dispute of material fact as to this issue, the court concludes that the remaining defendants are entitled to summary judgment. In sum, Woodhouse failed to exhaust available administrative remedies as to the claims against

them.[6]

## IV.

For the reasons discussed, the court will grant the defendants' motion for summary judgment.

The clerk is directed send a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 13th day of January, 2022.

/s/ *Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[6] To the extent Woodhouse claims that the defendants failed to protect him based on their April and July 2019 recommendations that he be housed in general population, his claims would fail. The record does not contain any ICA hearing documentation concerning Woodhouse's alleged April 2019 MDT recommendation. But even assuming that MDT did make that recommendation, it is clear from the record (which includes all relevant grievance records) that Woodhouse did not exhaust available administrative remedies as to this alleged MDT recommendation. The record reflects that ICA hearings were held on July 9, 18, and 30, 2019. Woodhouse, however, did not go to a general population assignment after these recommendations. At the first hearing in July, Woodhouse stated that he "would release to [general population] under the right circumstances[,] in a situation where he felt safe." (*See* ECF No. 1-1 at 9.) Based on this and the determination that Woodhouse was "not viewed as a threat to [Wallens Ridge] at [that] time," (*id.*) the MDT recommended that Woodhouse be released to general population, pending bed space. Woodhouse refused to go to general population, however, and at the subsequent two ICA hearings in July, the MDT recommended that Woodhouse remain in the restricted housing unit. Although Woodhouse may have exhausted administrative remedies as to the MDT's first July recommendation, based on his statement at the hearing and their determination that he was not at risk, Woodhouse has not shown that the defendants were deliberately indifferent to a serious risk of harm. Accordingly, any failure-to-protect claims regarding the April and July recommendations fail as a matter of law.